<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESSICA ROBINSON, STACEY JENNINGS, and NICOLE GIBSON, *individually and on behalf of all others similarly situated*, | Case No: 19-9066 (SDW) (LDW) |
| Plaintiffs, | **OPINION** |
| v. | |
| JACKSON HEWITT, INC., and TAX SERVICES OF AMERICA, INC., | October 31, 2019 |
| Defendants. | |

**WIGENTON,** District Judge.

Before this Court are Defendants Jackson Hewitt, Inc. ("JHI") and Tax Services of America, Inc.'s ("TSA") (collectively, "Defendants") Motion to Dismiss Plaintiffs Jessica Robinson ("Robinson"), Stacey Jennings ("Jennings"), and Nicole Gibson's ("Gibson") (collectively, "Plaintiffs") Second Consolidated Class Action Complaint ("SAC") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337. Venue is proper pursuant to 28 U.S.C. § 1391(b). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated below, Defendants' motion is **GRANTED in part, and DENIED in part**.

## I. BACKGROUND AND PROCEDURAL HISTORY

Defendants JHI and TSA, doing business as "Jackson Hewitt," comprise "the second largest full-service tax preparation business in the United States with franchised and company-

owned office locations through the country." (SAC ¶ 29, ECF No. 61.) TSA is Jackson Hewitt's largest franchisee, running "approximately 20% of the locations operating under the name 'Jackson Hewitt,' while the rest of the locations are run by non-owned franchisees." (*Id.* ¶ 32.) Franchisees "operate on standardized terms pursuant to a common franchise license agreement" ("Franchise Agreement"). (*Id.* ¶ 42.) According to the Franchise Agreement, franchisees "acknowledge that [they] are . . . independent contractor[s] and that no principal-agent, partnership, employment, joint venture or fiduciary relation exists" between them and Jackson Hewitt. (*Id.* ¶ 45; *see also id.* ¶ 49) Furthermore, franchisees are required to "hold themselves out as 'independently owned and operated[,]'" and they are expressly notified that they "may face competition from other franchisees, from outlets that [Jackson Hewitt] own[s], or from other channels of distribution or competitive brands that [Jackson Hewitt] controls." (*Id.* ¶¶ 45, 47.)

Plaintiffs bring this putative class action on behalf of themselves and "individuals who work or have worked for Jackson Hewitt" and its franchise locations.[1] (*Id.* ¶ 1.) They allege that from at least September 1, 2011 to at least December 20, 2018, Defendants "engaged in a conspiracy to not compete for employees" by expressly agreeing "not to solicit, recruit, or hire" each other's personnel without prior approval. (*Id.* ¶ 4; *see also id.* ¶¶ 52-55.) During the relevant time period, the Franchise Agreement included a "Covenant Against Recruiting or Hiring Our Employees," referred to as the so-called "No-Poach Clause" (or "Hiring Limitation"), which states:

> During the Term and for a period of two (2) years [afterward] . . .
> neither you nor any of your Owners may, without our prior written
> permission . . . solicit, recruit, or hire . . . any of our or our

---

[1] Robinson "worked as a seasonal Tax Preparer primarily at Jackson Hewitt's Rockland, Maine location from 2017 through 2018." (*Id.* ¶ 19.) Jennings "worked as a seasonal Tax Preparer for a Jackson Hewitt franchise . . . in Long Beach, California, from 2016 to 2017." (*Id.* ¶ 20.) Gibson "worked as a seasonal Tax Preparer and Manager for Jackson Hewitt franchise locations in Harrisburg, Pennsylvania, from 2002 to 2007 and from 2014 to 2016." (*Id.* ¶ 21.)

> Affiliates' employees whose duties with us or our Affiliates include(d) management of or over company-owned or franchised stores, franchisee training, tax preparation software writing or debugging, tax return processing, software writing or debugging, electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support.

(*Id.* ¶¶ 9, 56.)  "This prohibition against soliciting, recruiting, or hiring such employees remains in effect for one year after the termination of their employment with Jackson Hewitt or its affiliates." (*Id.* ¶ 57.)  The "No-Poach Penalty" (or "Recruiting Fee") punishes violations of the No-Poach clause by "imposing a severe monetary penalty, equal to 300% of the annual salary of the employee recruited or hired[.]" (*Id.* ¶ 10; *see also id.* ¶¶ 35, 58.)  The No-Poach Penalty applies to "any person then employed, or who was employed within the immediately preceding 24 months by" Defendants or franchisees. (*Id.* ¶ 58.)  Plaintiffs assert that these provisions unlawfully limited Plaintiffs' job mobility and suppressed their compensation. (*Id.* ¶¶ 6, 19-21, 60, 85-91.)

On December 20, 2018, Jackson Hewitt entered into an "Assurance of Discontinuance" ("AOD") with the State of Washington under which JHI "agreed, among other things, to remove the No-Poach Clause from its franchise agreement going forward and to cease enforcement of the No-Poach Clause." (*Id.* ¶ 93.)[2]

Plaintiffs filed the SAC, which is the operative complaint, on May 13, 2019.  The SAC alleges one count of violations under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Plaintiffs seek both injunctive relief and monetary damages. (*Id.* ¶ 130.)  On May 27, 2019,

---

[2] On the same day, Carson Newbauer filed *Newbauer v. Jackson Hewitt Tax Serv., Inc.*, Civ. No. 18-679 (E.D. Va.) ("*Newbauer*") in the United States District Court for the Eastern District of Virginia.  (ECF No. 31, at 2.)  On March 28, 2019, the Honorable Robert G. Doumar consolidated *Newbauer* and three other cases against Jackson Hewitt in the Eastern District of Virginia and transferred them to the District of New Jersey.  *Id. Newbauer* was the first case filed, which is relevant for statute of limitation purposes.  Newbauer is no longer a named plaintiff in this matter.

Defendants filed the instant Motion to Dismiss.  (ECF No. 65.)  Plaintiffs opposed the Motion to Dismiss on June 24, 2019, and Defendants replied on July 8, 2019.  (ECF Nos. 68-69.)

## II.  LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) may present either a facial or factual attack to a court's subject matter jurisdiction.  "A facial attack 'contests the sufficiency of the complaint because of a defect on its face,' whereas a factual attack 'asserts that the factual underpinnings of the basis for jurisdiction fail to comport with the jurisdictional prerequisites.'"  *Halabi v. Fed. Nat'l Mortg. Ass'n*, No. 17-1712, 2018 WL 706483, at *2 (D.N.J. Feb. 5, 2018) (internal citations omitted).  When reviewing facial attacks, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (citing *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012)).  In contrast, with a factual attack, "a court may weigh and 'consider evidence outside the pleadings.'"  *Id.* (quoting *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000)).

When considering a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party."  *In re Schering Plough Corp.*, 678 F.3d at 243 (citing *Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007)).  In so doing, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (external citation omitted).  Antitrust complaints, in particular, should be liberally construed.  *Knuth v. Erie-Crawford Dairy Co-op. Ass'n*, 395 F.2d 420, 423 (3d Cir. 1968).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, a complaint must set forth a "short and plain statement of the claim showing that a pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

## III. DISCUSSION

Defendants argue that dismissal of the SAC is necessary because: (1) Plaintiffs lack Article III standing to bring their Sherman Act claims or to seek injunctive relief; (2) Plaintiffs' claims prior to December 20, 2014 are barred by the statute of limitations; and (3) the "rule of reason" standard applies, and Plaintiffs fail to state a Sherman Act claim. (Def. Br. at 2, ECF No. 65-1.)

### A. Article III Standing

A federal court's jurisdiction under Article III of the United States Constitution is limited "to cases and controversies 'which are appropriately resolved through the judicial process.'" *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Aichele*, 757 F.3d at 357 (citing *Ballentine*, 486 F.3d at 810).

A plaintiff has standing if it can show that:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). When "prospective relief [such as an injunction] is sought, the plaintiff must show that he is 'likely to suffer future injury' from defendant's conduct" to have standing. *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (internal citations omitted). In the context of a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Blunt,* 767 F.3d at 279 (quoting *Lujan*, 504 U.S. at 561).

Defendants raise two challenges to Plaintiffs' Article III standing: (1) Plaintiffs have not alleged either injury-in-fact or causation sufficient to confer standing for their Sherman Act claims generally; and (2) Plaintiffs have not alleged prospective injury sufficient to confer standing for injunctive relief. Defendants make a facial attack on the SAC, so the court will "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Aichele*, 757 F.3d at 358.

### i.   Injury-in-Fact and Causation

Defendants first argue that Plaintiffs fail to "state any plausible causal link" between the No-Poach Clause and Plaintiffs' alleged injuries. (Def. Br. at 8.) Plaintiffs, however, allege they suffered reduced employment mobility and suppressed compensation, (SAC ¶¶ 6, 19-21, 85-91), pointing out noticeably lower pay for Jackson Hewitt employees as compared to the national average. (*Id*. ¶¶ 89-91.) This is sufficient to plead injury in fact. *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017), *cert. denied sub nom. Alcon Labs., Inc. v. Cottrell*, 138 S. Ct. 2029 (2018) (noting "financial harm is a 'classic' and 'paradigmatic form[]' of injury in fact" (internal citations omitted)).

Plaintiffs then allege that Defendants' conspiracy caused these injuries, specifically that the "No-Poach Clause, the No-Poach Penalty, and surrounding policies" were meant to, and did, "restrict[] competition for employees in the market." (SAC ¶ 62.) These restrictions, in turn, "reduc[ed] the pool of experienced candidates," "decreas[ed] the employment options available to current employees," and "lower[ed] the bargaining power of employees and depress[ed] wages." (*Id.* ¶¶ 13; *see also id.* ¶¶ 19-21, 62-63, 85-91.)[3] Therefore, Plaintiffs have plausibly pleaded causation.[4] Because Defendants do not challenge that a favorable decision by this Court would redress Plaintiffs' injury, Plaintiffs have Article III standing.

ii. Prospective Injury for Standing to Seek Injunctive Relief

Defendants next argue that Plaintiffs lack standing to seek injunctive relief because there is no threat of future injury. Defendants first assert that the "[No-Poach Clause] does not apply to [Plaintiffs] on a prospective basis" because it "only applies for one year after the end of employment," and Plaintiffs' employment ended "prior to the 2019 tax season." (Def. Br. at 16.) Plaintiffs allege that Robinson and Jennings worked through 2018 and 2017, respectively, and that the No-Poach Penalty applied to employees "employed within the immediately preceding 24 months," by Defendants or franchisees. (SAC ¶¶ 19-20, 58.) Even if the No-Poach Clause does

---

[3] Defendants argue that neither the No-Poach Clause nor the No-Poach Penalty could have caused Plaintiffs' injuries, because neither applied to Plaintiffs. (Def. Br. at 8; Reply Br. at 2-3 n. 6.) First, they point out that the No-Poach Clause does not explicitly prevent Defendants or franchisees from hiring from other franchisees. Plaintiffs allege that Defendants, nevertheless, "operated under the same policy to effectuate and enforce the Conspiracy." (SAC ¶ 63.) As pleaded, Plaintiffs' overall allegations are sufficient to show the No-Poach Clause's role in a conspiracy causing Plaintiffs' injuries. Second, Defendants argue that the No-Poach Penalty never applied, pointing to the Franchise Disclosure Document ("FDD") and Franchise Agreement, which they provide. (ECF No. 69-2.) The Court may consider these documents without converting this motion to a motion for summary judgment, as Plaintiffs explicitly rely on them in the SAC. (*See, e.g.*, SAC ¶¶ 44-47, 50, 58.); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The documents do not resolve the factual dispute on whether the No-Poach Penalty applied, and at this stage, the Court will accept as true Plaintiffs' allegations on the No-Poach Penalty's applicability. *See Flora v. County of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015).

[4] The Third Circuit has also analogously found antitrust standing where an allegedly illegal no-hire agreement caused plaintiffs to be "precluded from selling their services [in a competitive market]." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 142 (3d Cir. 2001), *as amended* (June 12, 2001).

not apply prospectively, because Robinson and Jennings' employment mobility will still be limited by the No-Poach Penalty, Plaintiffs have sufficiently pleaded prospective injury.[5]

Second, Defendants argue that there will be no prospective injury because Defendants "agreed not to enforce the [No-Poach Clause]" with the Washington Attorney General through the AOD. (Def. Br. at 16.) This alone is insufficient. "A party can generally obtain injunctive relief for past conduct that is likely to recur; the wrongdoer cannot avoid an injunction by voluntarily ceasing its illegal conduct." *Fed. Trade Comm'n v. Shire ViroPharma, Inc.*, 917 F.3d 147, 157 (3d Cir. 2019); *see also U.S. v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953). Although "voluntary cessation of illegal conduct does render a challenge to that conduct moot where (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *La. Counseling & Family Servs., Inc. v. Makrygialos, LLC*, 543 F. Supp. 2d 359, 366 (D.N.J. 2008) (citing *Friends of the Earth, Inc.*, 528 U.S. at 189), this is a heavy burden. *W. T. Grant Co.*, 345 U.S. at 633.[6]

Because the AOD does not make it "absolutely clear that the alleged wrongful behavior could not reasonably be expected to occur," *DeJohn v. Temple Univ.*, 537 F.3d 301, 310 (3d Cir. 2008) (citing *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)), Plaintiffs have pleaded standing for injunctive relief.

B. Statute of Limitations and Fraudulent Concealment

---

[5] To the extent Jennings' employment does not fall within the 24-month window, Robinson's clearly does, and this is sufficient to grant Plaintiffs injunctive standing. *See Freedom from Religion Found. Inc.*, 832 F.3d at 481 n.14 (finding the Court "need not address the standing of the other plaintiffs to pursue injunctive relief" when it found one plaintiff had standing to do so).

[6] Defendants argue Plaintiffs first must "demonstrate 'some cognizable danger of recurrent violation'" exists, in order to invoke the voluntary cessation doctrine. (Reply Br. at 10 n. 22 (quoting *W. T. Grant Co.*, 345 U.S. at 633)). As noted above, Plaintiffs have pleaded the No-Poach Penalty still affects them, and the AOD alone does not prove their injuries have stopped, and so there plausibly remains a potential cognizable danger of recurrent violation.

"A suit under the Sherman Act must be 'commenced within four years after the cause of action accrued.'" *In re Aspartame Antitrust Litig.*, 416 F. App'x 208, 211 (3d Cir. 2011) (quoting 15 U.S.C. § 15b). "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). "In the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues [and] . . . the statute of limitations runs from the commission of the act." *Zenith Radio Corp.*, 401 U.S. at 338.

Here, the SAC alleges that Defendants' alleged conspiracy began "no later than September 1, 2011." (SAC ¶ 122.) *Newbauer*, which was commenced on December 20, 2018, was the first filed action related to the instant consolidated putative class action. Thus, the Sherman Act's four-year statute of limitation bars claims that allegedly accrued prior to December 20, 2014.

Plaintiffs argue that fraudulent concealment tolls the limitations period until July 9, 2018, the date they claim they had actual or constructive knowledge of the conspiracy. (Pls. Br. at 21-22, ECF No. 68.) The Court disagrees. Plaintiffs must satisfy three elements to show fraudulent concealment: "(1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts." *Cunningham v. M & T Bank Corp.*, 814 F.3d 156, 161 (3d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir.2006)). Plaintiffs' fraudulent concealment allegations must also meet the heightened pleading requirements of Rule 9(b). *See Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d

Cir. 1984). Additionally, tolling for fraudulent concealment is an "extraordinary remedy which should be extended only sparingly." *Cunningham*, 814 F.3d at 161 (citing *Hedges v. U.S.*, 404 F.3d 744, 751 (3d Cir. 2005)).

Plaintiffs allege that Defendants "did not inform employees of the Conspiracy," and gave "false and pretextual explanations for hiring and compensation decisions," such that Plaintiffs "could not have discovered [the conspiracy] through reasonable diligence." (SAC ¶¶ 115-119). This is insufficient to show fraudulent concealment under the heightened Rule 9(b) standard. "To satisfy this standard, Plaintiffs must plead, *inter alia*, 'the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Fuqua v. Bristol-Myers Squibb Co.*, 926 F. Supp. 2d 538, 549 (D.N.J. 2013) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). Plaintiffs' allegations lack this detail, and their argument that Defendants did not "inform" them of the conspiracy lacks merit. *See Gutierrez v. TD Bank*, Civ. No. 11-5533, 2012 WL 272807, at *9 (D.N.J. Jan. 27, 2012) (noting "inaction or silence" or "generalized allegations" that defendant "actively misled" plaintiffs are insufficient to show fraudulent concealment); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987) (finding that "[t]o permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct upon this sort of timid inquiry would effectively nullify the statute of limitations in these cases").

Additionally, the documents Plaintiffs allege Defendants concealed were publicly available. (*See* Def. Br. at 11-12; *see also* SAC ¶ 117.) *See, e.g.*, *Juday v. Merck & Co Inc*, 730 F. App'x 107, 112 n.5 (3d Cir. 2018) (noting that "publicly available information would appear to be inconsistent with any claim of fraudulent concealment"); *see also Pocahontas Supreme Coal Co.*, 828 F.2d at 217-18 (rejecting plaintiff's fraudulent concealment argument when the

allegedly concealed information was "necessarily discoverable upon simple inquiry and consultation of public records"). Plaintiffs could have discovered these agreements had they conducted any due diligence. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1179 (3d Cir. 1993) (requiring "the exercise of due diligence" in the antitrust context). Plaintiffs have not shown that the extraordinary remedy of fraudulent concealment should apply.

## C. Sherman Act Violations[7]

"Section 1 of the Sherman Act prohibits '[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce.'" *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 441 (3d Cir. 2016) (quoting 15 U.S.C. § 1). To make a § 1 claim, an antitrust plaintiff must plead: "(1) 'that the defendant was a party to a contract, combination . . . or conspiracy'[;] and (2) 'that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.'" *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)).[8]

### i. Contract, Combination or Conspiracy Among Separate Entities

First, Defendants argue that they and the franchisees "constitute a single economic entity" (Def. Br. at 19) and are, therefore, incapable of forming a conspiracy under §1 of the Sherman Act. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). "The relevant inquiry . . . is whether there is a 'contract, combination . . ., or conspiracy' amongst 'separate economic actors pursuing separate economic interests' such that the agreement

---

[7] Plaintiffs bring claims under both §§ 1 and 3 of the Sherman Act. (SAC ¶ 122.) Section 3's language is virtually the same as § 1's, but extends § 1's prohibitions to U.S. territories and the District of Columbia. Therefore, this Court will analyze Plaintiffs' § 3 claims under the same standards as it does Plaintiffs' § 1 claims.

[8] The "courts have limited their attention to [these] two essential elements." *BanxCorp v. Bankrate Inc.*, Civ. No. 07-3398, 2012 WL 3133786, at *5 (D.N.J. July 30, 2012), *modified on reconsideration*, Civ. No. 07-3398, 2012 WL 3988182 (D.N.J. Sept. 11, 2012). The test in full requires plaintiffs prove: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action." *Mylan Pharm.*, 838 F.3d at 441.

'deprives the marketplace of independent centers of decisionmaking . . . ." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (quoting *Copperweld Corp.*, 467 U.S. at 769).

Plaintiffs allege that, per the Franchise Agreement: (1) there is "no principal-agent, partnership, employment, joint venture or fiduciary relation [which] exists between [franchisee] and [franchisor]"; (2) franchisees are "independent contractors," and are required to "hold themselves out as 'independently owned and operated'"; (3) the Franchise Agreement is "solely a license to use [JHI's] Marks in a tax return preparation business using [JHI's] Operating System"; (4) franchisees "compete with each other and with Jackson Hewitt's company-owned locations"; and (5) "all decisions related to employment are to be made entirely and independently by each franchisee," including "recruitment, hiring, firing . . . compensation . . . and other day-to-day management of employees," and that none of the franchisee's "employees shall be considered or represented as [the franchisor's] employees or agents." (SAC ¶¶ 43-50.) This is sufficient to plead that franchisees, in the employment context, are "separate economic actors pursing separate economic interests," and would "mak[e their] own market decisions" regarding employment, but for "their agreement to cooperate." *Am. Needle, Inc.*, 560 U.S. at 195, 200; *see also id.* at 196-97 (holding that National Football League teams were separately controlled, potential competitors, capable of conspiring under § 1 of the Sherman Act, because the teams were "independently owned, and independently managed business[es]," "compete[d] with one another" for fans, gate receipts, and managers and players, and in making decisions, did "not pursu[e] the 'common interests of the whole' league, but, instead the interests of each 'corporation itself'" (internal citations omitted)).[9] Plaintiffs have sufficiently alleged that

---

[9] The factors Defendants argue show that they and franchisees are not separate entities under the Sherman Act (Def. Br. at 20) are insufficient at this stage. *See Am. Needle, Inc.*, 560 U.S. at 198 (noting that while entities may have "common interests such as promoting [their] brand, they are still separate, profit-maximizing entities, and their interests in [the conduct in question] are not necessarily aligned").

Defendants and franchisees may be separate entities, capable of forming an actionable conspiracy under §1 of the Sherman Act.

## ii. Unreasonable Restraint on Trade

Courts evaluate whether a defendant imposed an "unreasonable restraint on trade" in violation of the Sherman Act using one of the following three standards of review: (i) "*per se*," (ii) "quick look", or (iii) "rule of reason." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315-18. The parties dispute which standard applies to Plaintiffs' claims.

Plaintiffs assert the *per se* standard applies, but state their claims show an unreasonable restraint on trade under any of the three standards of review. (Pls. Br. at 32; SAC ¶¶ 6-8.) In contrast, Defendants argue Plaintiffs' claims must be examined under the "rule of reason," and that Plaintiffs have failed to state a claim under this standard. (Def. Br. 20-21.) The Court declines to determine the applicable standard of review at this stage of proceedings. To do so would be premature and more factual information is required. *See, e.g.*, *CSR Ltd. v. Fed. Ins. Co.*, 40 F. Supp. 2d 559, 564-65 (D.N.J. 1998) (finding at the motion to dismiss stage that discovery was necessary to determine which standard to apply); Philip E. Areeda & Herbert Hovencamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, §305e (4th ed. 2014) (noting that often, "the decision about which rule is to be employed will await facts that are developed only in discovery").

For purposes of the instant motion to dismiss, accepting all facts alleged as true and making all inferences in favor of Plaintiffs, the Court finds that Plaintiffs plausibly allege Defendants' conduct unreasonably restrained trade. Plaintiffs allege that Defendants' conspiracy, namely via the No-Poach Clause and Penalty, limited competition within the market, and artificially depressed wages, (SAC ¶¶ 12-13, 52-63, 85-91), and from the facts alleged, "no

procompetitive objective can be attached to defendants' conduct." *CSR Ltd.*, 40 F. Supp. 2d at 565; *see also Fuentes v. S. Hills Cardiology*, 946 F.2d 196, 202 (3d Cir. 1991).

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED** as to any claims from conduct that occurred prior to December 20, 2014, and **DENIED** as to all remaining claims.  An appropriate Order follows.

s/ *Susan D. Wigenton*_____
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:      Clerk
cc:        Leda Dunn Wettre, U.S.M.J.
           Parties