**LITE DEPALMA GREENBERG**
**& AFANADOR, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 877-3820
bgreenberg@litedepalma.com

*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JESSICA ROBINSON, STACEY JENNINGS, and PRISCILLA MCGOWAN, individually and on behalf of others similarly situated, | : : : : : | Civil Action No.: 2:19-cv-9066 (SDW)(ESK) |
| *Plaintiffs*, | : : | **FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** |
| v. | : : : | |
| JACKSON HEWITT, INC. and TAX SERVICES OF AMERICA, INC., | : : : | |
| *Defendants*. | : : | |

835281.2

# TABLE OF CONTENTS

**Page(s)**

I.  SUMMARY OF THE ACTION ......................................................................... 1

II.  JURISDICTION AND VENUE............................................................................ 6

III.  THE PARTIES................................................................................................... 7

IV.  FACTUAL ALLEGATIONS............................................................................... 9

a.  Jackson Hewitt's Franchise Model Makes All Franchisees Independent Contractors Who Compete with Jackson Hewitt and with Each Other ...................................................... 13

b.  Jackson Hewitt's Independent Franchisees Exercise Sole and Complete Decision-Making Authority as to All Employment-Related Decisions of Jackson Hewitt Franchise Offices ................................................................................................................. 14

D.  Employee Recruitment, Hiring, and Training ................................................. 19

V.  CO-CONSPIRATORS AND AGENTS .......................................................... 28

VI.  CLASS ACTION ALLEGATIONS ................................................................. 29

VII.  ANTICOMPETITIVE EFFECTS AND LACK  OF PROCOMPETITIVE JUSTIFICATION ........................................................................................... 31

VIII.  CLAIM FOR RELIEF...................................................................................... 33

IX.  DEMAND FOR JURY TRIAL ....................................................................... 35

X.  PRAYER FOR RELIEF ................................................................................... 35

i

Plaintiffs Jessica Robinson, Stacey Jennings, and Priscilla McGowan bring this case under United States antitrust laws on behalf of themselves and all others similarly situated (the "Class," defined below) against Defendants Jackson Hewitt, Inc. and Tax Services of America, Inc. (collectively, "Jackson Hewitt" or "Defendants") based on Defendants' conspiracy between and among themselves and unnamed co-conspirators to suppress employee compensation, including that of Plaintiffs and the Class. All allegations are upon information and belief based upon the investigation of counsel, other than those concerning Plaintiffs personally. Plaintiffs bring this action to recover damages, including treble damages and other appropriate relief, and further allege as follows:

## I.   SUMMARY OF THE ACTION

1.     This is an antitrust class action brought by and on behalf of individuals who work or have worked for Jackson Hewitt, a tax preparation services provider and franchisor, and for franchise locations of Jackson Hewitt.

2.     Jackson Hewitt is the second largest consumer tax services provider in the United States and provides tax preparation and assistance services at physical offices, online, and via desktop and mobile applications. Jackson Hewitt provides in-person tax preparation services at nearly 6,000 offices in the United States. Of those offices, approximately 3,900 are franchise locations and 1,800 are

835281.2

corporate-owned. Under Jackson Hewitt's franchise model, franchisees compete with each other and with company-owned locations.

3.      Personnel in any labor market, including in the tax preparation labor market, benefit when employers compete for their services. Competition in the labor market creates negotiating leverage for personnel, which in turn leads to higher wages and greater mobility.

4.      Beginning at least by December 20, 2014, and continuing to the present day, Defendants, along with other unnamed persons and entities acting as co-conspirators, engaged in a conspiracy to not compete for employees and potential employees, including, but not limited to, agreements not to solicit, recruit, or hire without prior approval each other's personnel (the "No-Poach/No-Hire Conspiracy" or "Conspiracy"). Defendants formed, entered into, carried out, and enforced the anti-competitive contract, combination, or conspiracy described herein.

5.      Defendants orchestrated, dispersed, and enforced the agreement among themselves and all franchisees, including at least in part through an explicit contractual prohibition ("No-Poach Clause") and a penalty provision for violations of the No-Poach Clause ("No-Poach Penalty") contained in standard Jackson Hewitt franchise agreements.

835281.2

6.      The Conspiracy, and the anticompetitive agreements between and among Defendants and co-conspirators in furtherance thereof, are and were naked restraints of trade that constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Conspiracy, and the agreements and conduct by Defendants and co-conspirators in furtherance thereof, had the purpose and effect of unlawfully limiting Plaintiffs' and Class members' job mobility and suppressing their compensation below the levels that would have been available absent the Conspiracy.

7.      Under a "quick look" analysis, one with even a rudimentary understanding of economics could conclude that the arrangements and agreements between and among Defendants and their co-conspirators alleged herein would have an anticompetitive effect on Class members and markets.

8.      Under a rule of reason analysis, Defendants and unnamed co-conspirators exploited their collective market power in the relevant market, which is the labor market for employees and potential employees of Jackson Hewitt and its franchises, as defined herein, in the United States. The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects. In the alternative, even if the Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof have or had

3

835281.2

procompetitive effects, any such procompetitive effects are and were substantially outweighed by the anticompetitive harm caused by the Conspiracy and Defendants' and others' conduct in furtherance thereof as alleged herein.

9.      The standard Jackson Hewitt franchise agreement in effect during the Class Period included a "Covenant Against Recruiting or Hiring Our Employees" clause, which stated:

> During the Term and for a period of two (2) years [afterward]… neither you nor any of your Owners may, without our prior written permission … solicit, recruit, or hire….any of our or our Affiliates' employees whose duties with us or our Affiliates include(d) management of or over company-owned or franchised stores, franchisee training, tax preparation software writing or debugging, tax return processing, software writing or debugging, electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support.

10.      During the Class Period, Jackson Hewitt's standard franchise agreement also contained a provision that punished and discouraged violations of the No-Poach Clause by imposing a severe monetary penalty, equal to 300% of the annual salary of the employee recruited or hired in violation of the No-Poach Clause.

11.      The Conspiracy involves, at a minimum, Jackson Hewitt as well as its franchisees. Not only did Jackson Hewitt and its franchisees expressly agree for franchisees to not solicit or recruit employees from either other franchisees or from

835281.2

Jackson Hewitt's company-owned stores, Jackson Hewitt itself adhered to the same agreement in the operation of its company-owned stores.

12.     The purpose and effect of the restraint was to limit and suppress mobility and compensation for all Class members, regardless of whether they tried to be recruited or hired by another Jackson Hewitt corporate or franchise location.

13.     These agreements impeded or restricted the movement of employees between Jackson Hewitt and its franchisees. These agreements also prohibited and prevented competition for employees between and among the members of the Conspiracy, including Jackson Hewitt and its franchisees. The agreements unreasonably limited franchisees' ability to solicit employees who work for Jackson Hewitt or other franchisees, reducing the pool of experienced candidates available to them, and decreasing the employment options available to current employees. Basic economic principles inform that a reduction in the pool of potential employers tends to lower the bargaining power of employees and depress wages.

14.     The Conspiracy, and its anticompetitive effects on Class members' mobility and wages, is ongoing.

835281.2

## II.    JURISDICTION AND VENUE

15.    Plaintiffs bring this action to obtain injunctive relief and recover actual and treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

17.    As alleged in detail herein, including in Section IV(B), venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Defendants reside in, can be found in, and/or transact business in this District.

18.    In particular, all Jackson Hewitt Defendants are headquartered in the District of New Jersey and maintain their principal place of business in the District of New Jersey.

19.    Defendants are also subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of New Jersey. Each Defendant, among other things: (a) transacted business throughout the United States, including in this District; (b) had substantial

835281.2

contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

### III.   THE PARTIES

20.     Plaintiff Jessica Robinson is an individual residing in Rockland, Maine. Plaintiff Robinson worked as a seasonal Tax Preparer primarily at Jackson Hewitt's Rockland, Maine location from 2017 through 2018. As a result of the conspiracy, Ms. Robinson's compensation and mobility were suppressed.

21.     Plaintiff Stacey Jennings is an individual residing in Paramount, California. During the Class Period, Plaintiff Jennings worked as a seasonal Tax Preparer for a Jackson Hewitt franchise located at the Walmart Supercenter at Long Beach Towne Center in Long Beach, California, from 2016 to 2017. As a result of the conspiracy, Ms. Jennings's compensation and mobility were suppressed.

22.     Plaintiff Priscilla McGowan is an individual residing in Memphis, Tennessee. During the Class Period, Plaintiff McGowan worked as a seasonal Tax Preparer for a Jackson Hewitt corporate location located in Memphis, Tennessee from 2017 to 2020. As a result of the conspiracy, Ms. McGowan's compensation and mobility were suppressed.

835281.2

23.     Defendant Jackson Hewitt, Inc. ("JHI") is a Virginia corporation with headquarters at 10 Exchange Place, 27th Floor, Jersey City, New Jersey 07302. JHI is the operating company within the Jackson Hewitt enterprise and is wholly-owned by Jackson Hewitt Tax Services, Inc. Among other things, it performs the enterprise's core business and administrative functions. It directly participated in the unlawful anticompetitive conspiracy at issue here, including by implementing the nationwide franchise model and entering into express written agreements that evidence and exemplify the anticompetitive conduct Plaintiffs challenge herein.

24.     Defendant Tax Services of America, Inc. ("TSA") is a Delaware corporation headquartered at 10 Exchange Place, 27th Floor, Jersey City, New Jersey 07302. TSA is a wholly-owned subsidiary of JHI. In 1999, Jackson Hewitt formed TSA by contributing a majority of its company-owned locations to TSA. During the Class Period, TSA directly operated Jackson Hewitt's company-owned locations nationwide, which currently make up approximately 20% of all Jackson Hewitt locations. TSA directly participated in the unlawful anticompetitive conspiracy alleged herein, including by carrying out its terms and committing other overt acts in furtherance of the Conspiracy. JHI derives substantial income from the operations of TSA.

25.     Defendant Jackson Hewitt, Inc., and Defendant Tax Services of America, Inc. together are referred to herein as Jackson Hewitt.

8

26.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit and the identities of which are presently unknown, including Jackson Hewitt franchisees, as well as direct and indirect subsidiaries of Defendant Jackson Hewitt, Inc. that operate company-owned stores, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the Conspiracy, or in furtherance of the anticompetitive conduct. Plaintiffs reserve the right to name some or all of these persons and entities at a later date.

27.     Whenever this Complaint references any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## IV.    FACTUAL ALLEGATIONS

### A.    Trade and Commerce

28.     Throughout the Class Period, Jackson Hewitt and co-conspirators employed Class members throughout the United States, including in this District.

29.     Jackson Hewitt's conduct substantially affected interstate commerce,

9

and caused antitrust injury, throughout the United States.

**B.      The Jackson Hewitt Franchise**

30.      Doing business as Jackson Hewitt, Defendants collectively provide tax preparation services to Americans seeking to file their income taxes with the federal government and their respective state governments. Through a network of approximately 6,000 locations nationwide, Jackson Hewitt is the second largest full-service tax preparation business in the United States with franchised and company-owned office locations. Jackson Hewitt Tax Services, Inc. and Jackson Hewitt, Inc. operates through a tightly controlled system of franchisees.

31.      Jackson Hewitt was founded in 1982 by John Hewitt, a former Regional Manager of H&R Block, who started working for H&R Block in 1969. Hewitt, along with a group of investors, purchased the six-location Mel Jackson's Tax Service of Norfolk, Virginia in 1982 and renamed it Jackson Hewitt.

32.      Jackson Hewitt began selling franchises in 1986 and rapidly expanded throughout the United States through its franchise program. Jackson Hewitt began contracting with the Montgomery Ward department store chain in 1989 to open offices in 169 of its store locations. By 1992, Jackson Hewitt became the second-largest tax preparation chain, behind H&R Block. Since then, Jackson Hewitt has opened locations in national retail chains including Wal-Mart, Sam's Club, Kmart, and Sears.

33.     In 1999, Jackson Hewitt formed TSA to own and operate a majority of its company-owned locations. Of Jackson Hewitt's franchisees, TSA is the largest, directly operating approximately 20% of the locations operating under the name "Jackson Hewitt," while the rest of the locations are run by non-owned franchisees.

34.     By no later than 2000, Jackson Hewitt's standard franchise agreement, entered into between Jackson Hewitt and each and every franchisee nationwide, contained the No-Poach Clause, an express provision restricting the soliciting, recruiting, and hiring of certain employees by and between franchisees and company-owned locations.

35.     Jackson Hewitt filed for Chapter 11 bankruptcy on May 24, 2011. The United States Bankruptcy Court for the District of Delaware approved Jackson Hewitt's Amended Joint Prepackaged Plan of Reorganization on August 9, 2011.

36.     During the Class Period, Jackson Hewitt's standard franchise agreement, entered into between Jackson Hewitt and each and every franchisee nationwide, also contained the No-Poach Penalty, an express provision that punishes and discourages violations of the No-Poach Clause by assessing a heavy monetary penalty for each violation of the No-Poach Clause.

37.     As stated in its 2018 Franchise Disclosure Document ("FDD"), Jackson Hewitt's total revenues for fiscal year 2018 were about $244.5 million.

835281.2

38.     At its peak, Jackson Hewitt had over 7,400 company-owned and franchise locations that prepared more than 3.4 million tax returns in a single tax season.

39.     Today, Jackson Hewitt has nearly 6,000 office locations in the United States, with approximately 1,900 corporate-owned offices and 3,800 franchise offices. About half of all Jackson Hewitt offices are located inside Wal-Mart stores. There are both corporate-owned and franchise locations in virtually every state and the District of Columbia. Jackson Hewitt is, and has been throughout the Class period, the second-largest tax preparation firm in the United States.

40.     Jackson Hewitt's major revenue sources include tax preparation fees and related services performed at corporate-owned tax offices, franchise royalties, sales of desktop tax preparation software, and fees from related services and products.

41.     Jackson Hewitt holds itself out as an "industry leading provider of full-service individual, federal, and state income tax preparation with offices all across the country." https://www.jacksonhewitt.com/careers/ (last visited Dec. 14, 2018).

42.     Jackson Hewitt states on its public website that it employs "over 25,000 Tax Pros who know taxes and tax reform inside and out." https://www.jacksonhewitt.com/ (last visited Dec. 14, 2018).

a.   **Jackson Hewitt's Franchise Model Makes All Franchisees Independent Contractors Who Compete with Jackson Hewitt and with Each Other**

43.     Jackson Hewitt franchisees throughout the United States operate on standardized terms pursuant to a common franchise license agreement. They are competitors with Jackson Hewitt and with each other.

44.     Jackson Hewitt franchise offices operate as independent companies and separate economic entities from Jackson Hewitt.

45.     Jackson Hewitt franchisees are independent contractors. Such franchisees independently own and operate their businesses. As stated in Jackson Hewitt's standard franchise agreement, Jackson Hewitt franchisees function in an "independent contractor" relationship with Jackson Hewitt Defendants.

46.     Jackson Hewitt makes clear in its standard franchise agreement to Jackson Hewitt franchisees, "[y]ou acknowledge that you are an independent contractor and that no principal-agent, partnership, employment, joint venture or fiduciary relation exists between you and us." In fact, the standard franchise agreement specifically requires that franchisees hold themselves out as "independently owned and operated."

47.     Jackson Hewitt further makes clear in its standard franchise agreement to Jackson Hewitt franchisees that, "[y]ou are not authorized to make any contract, warranty or representation, or incur any obligation on our behalf,"

13

and that "[t]his Agreement is solely a license to use our Marks in a tax return preparation business using our Operating System."

48.    Moreover, Jackson Hewitt's standard franchise agreement states that its franchisees compete with each other and with Jackson Hewitt's company-owned locations. The franchise agreement expressly notifies franchisees that, "you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."

**b.    Jackson Hewitt's Independent Franchisees Exercise Sole and Complete Decision-Making Authority as to All Employment-Related Decisions of Jackson Hewitt Franchise Offices**

49.     Jackson Hewitt on the one hand, and the franchisees on the other, purport to make separate and independent decisions.

50.    Jackson Hewitt's standard franchise agreement states that all decisions related to employment are to be made entirely and independently by each franchisee. Further, it states that employees of the franchisee are not employees of Jackson Hewitt:

> Since you are an independent contractor, you have the sole right to control all aspects of your relationships with your employees and prospective employees, including all decisions regarding hiring, firing, training, supervision, discipline, scheduling (including if you use any scheduling modules we provide to you ) and compensation (paying wages and withholding and paying taxes) in respect of your employees…Neither you, nor your manager or your employees shall be considered or represented as our employees or agents.

51.     Thus, as Jackson Hewitt's standard franchise agreement and FDD makes clear, Jackson Hewitt franchise locations are intended to compete, and do compete, with each other as well as with Jackson Hewitt corporate-owned locations. Each franchisee independently owns and operates its franchise location(s) as such. Among other things, such franchisees possess and exercise sole and complete decision-making authority as to all employment-related decisions, including, but not limited to, recruitment, hiring, firing, advancement, promotion, staffing, compensation, conditions of employment, discipline, and other day-to-day management of employees.

52.     But for the conspiracy, and the conduct of Jackson Hewitt and its co-conspirators in furtherance thereof, each Jackson Hewitt franchisee would have been free to make its own market decisions relating to recruitment, hiring, firing, advancement, promotion, staffing, wages, conditions of employment, discipline, and other day-to-day management of employees throughout the Class Period. But for the conspiracy, and the conduct of Jackson Hewitt and its co-conspirators in furtherance thereof, Jackson Hewitt franchisees would have competed with other Jackson Hewitt franchisees and with Jackson Hewitt itself for employees, and would have solicited, recruited, and hired employees from other Jackson Hewitt franchisees and from Jackson Hewitt corporate-owned locations throughout the Class Period.

**C.      The No-Poach Agreements Between and Among Competing Jackson Hewitt Locations Owned by Defendants and by Franchisees**

53.     Notwithstanding the provisions of the standard franchise agreement, including its definition of the franchisor-franchisee relationship as a competitive one, Jackson Hewitt and its franchisees have agreed not to compete with respect to recruiting, soliciting, and hiring of employees.

54.     Beginning at least by December 20, 2014, and continuing through the present, Jackson Hewitt, along with unnamed co-conspirators, carried out a scheme related to the solicitation, recruitment, and hiring of employees and potential employees, which included policies and agreements not to solicit, recruit, or hire each other's personnel without prior approval.

55.     As alleged herein, the Conspiracy, including the anticompetitive No-Poach agreements, were between and among separate economic actors pursuing separate economic interests such that the agreements deprive the marketplace generally and the Class members in particular of the benefits of independent centers of decision making as well as the benefits of free and open competition.

56.     In relation to and in furtherance of the Conspiracy, Jackson Hewitt and its franchisees entered into express contractual agreements forbidding competition for employees among franchisees and Jackson Hewitt's corporate-owned tax offices. In particular, the standard language in Jackson Hewitt's franchise agreements with all franchisees who executed franchise agreements

16

during the Class Period includes an express No-Poach Clause that prohibits franchisees from soliciting, recruiting, or hiring employees of their competitors – other Jackson Hewitt franchisees and Jackson Hewitt and its affiliates.

57.     The standard franchise agreement between Jackson Hewitt and its franchisees during the Class Period included a clause entitled "Covenant Against Recruiting or Hiring Our Employees" that states:

> During the Term and for a period of two (2) years [afterward]…
> neither you nor any of your Owners may, without our prior written
> permission … solicit, recruit, or hire….any of our or our Affiliates'
> employees whose duties with us or our Affiliates include(d)
> management of or over company-owned or franchised stores,
> franchisee training, tax preparation software writing or debugging, tax
> return processing, software writing or debugging, electronic filing of
> tax returns, tax return processing, processing support, tax return
> preparation, or tax return preparation advice or support.

58.     This prohibition against soliciting, recruiting, or hiring such employees remains in effect for one year after the termination of their employment with Jackson Hewitt or its affiliates.

59.     Moreover, beginning no later than 2015 and continuing through at least July 2018, the standard franchise agreement included a "Recruiting Fee" in connection with the No-Poach Clause. As described in the FDD, the fee was "300% of the annual salary of person recruited or hired." In "plain English," this fee applies:

> if you recruit or hire any person then employed, or who was employed
> within the immediately preceding 24 months by us, any of our

17

Affiliates, or a Jackson Hewitt franchise owner, or any of our or our Affiliates' officers or directors.

60.     Duane Mora, Jackson Hewitt's Senior Vice President of Franchise Operations, admitted that Jackson Hewitt's No-Poach Penalty was intended to act as a "disincentive for new franchisees" to violate Jackson Hewitt's No-Poach Clause in order to "protect existing franchisees from having their best tax preparers hired away from them." Julie Bennett, *Switches at top for Jackson Hewitt*, May 23, 2017, available at https://www.franchisetimes.com/June-July-2017/Switches-at-top-for-Jackson-Hewitt/.

61.     Accordingly, Jackson Hewitt has acknowledged that the No-Poach Clause and the No-Poach Penalty were in furtherance of the Conspiracy, which purpose and effect was to reduce and/or eliminate competition for employees between and among Jackson Hewitt Defendants and their co-conspirators and to suppress employee compensation.

62.     The No-Poach agreements, including but not limited to the No-Poach Clause and the No-Poach Penalty, were not intended or limited to simply protecting Jackson Hewitt's investment in training its employees at corporate-owned offices. After all, the franchise offices' employees were required to meet the same training requirements. Indeed, the No-Poach Clause and No-Poach Penalty were part of a larger No-Poach Culture wherein Jackson Hewitt stores, whether

18

corporate or franchise, would not recruit, solicit, or hire employees from other Jackson Hewitt stores.

63.     The restriction placed on franchisees from poaching **employees from other franchisees** further underscores the true purpose and value of the No-Poach Clause, the No-Poach Penalty, and surrounding policies to Jackson Hewitt: restricting competition for employees in the market and artificially suppressing wages among competing firms in a highly specialized sector.

64.     While the No-Poach Clause and the No-Poach Penalty in the standard franchise license agreement ostensibly placed an obligation only upon franchisees, Jackson Hewitt operated under the same policy to effectuate and enforce the Conspiracy. The purpose and effect of this provision is to enforce and perpetuate the Conspiracy, in particular, by identifying, preventing, discouraging, and punishing violations of the anticompetitive agreements.

## D.     Employee Recruitment, Hiring, and Training

65.     As the second largest provider of tax preparation services in the United States, Jackson Hewitt needs workers trained not only in tax preparation and assistance but also in Jackson Hewitt's System. The same is true for Jackson Hewitt franchisees.

66.     At the height of the 2018 tax season, Jackson Hewitt's corporate and franchise owned locations employed over 25,000 individuals, including tax professionals, most of whom were seasonal.

67.     Due to the seasonal nature of tax preparation and related services, Jackson Hewitt and its franchisees recruit and hire a large number of new or returning employees every year. As Jackson Hewitt highlights in its 2010 Form 10-K disclosure to the Securities and Exchange Commission, "[w]e generate substantially all our revenues during the period from January 1 through April 30," which "presents a number of operational challenges for us and our franchisees" such as the ability to maintain "flexible staffing" to meet its seasonal staffing needs "because the number of employees at our network's offices during the peak of the tax season is exponentially higher than at any other time[.]"

68.     Jackson Hewitt's 10-K further underscores the importance of recruiting and hiring large numbers of qualified tax preparers each tax season in disclosing that, if "we were to experience significant business interruptions during the tax season, which may be caused by labor shortages" or other significant events, "we could experience a loss of business, which could have a material adverse effect on our business, financial condition and results of operations."

69.     Moreover, Jackson Hewitt states that its "[a]ctual results may differ materially from those contemplated (expressed or implied) by [its] forward-looking

statements" in its 10-K due to "potential risks and uncertainties" such as "our ability to successfully attract and retain key personnel," and that "[c]ompetition for executive, managerial and skilled personnel in our industry remains intense."

70.     As Jackson Hewitt recognized in its Form 10-K filing, the regular need each tax season for qualified tax preparation workers would otherwise lead to healthy competition between Jackson Hewitt, its franchise locations, and other companies providing tax preparation services, and thus, higher wages, benefits, compensation, and other terms of employment. Instead, as part of its efforts to avoid "significant business interruptions during the tax season, which may be caused by labor shortages," in a labor market with "intense" competition, Jackson Hewitt conspired with its franchisees and other co-conspirators to restrict employee mobility and competition in the market, with the purpose and effect of reducing and restricting mobility and limiting and reducing wages, benefits, compensation, and other terms of employment.

### a.      Jackson Hewitt Employee Training and Requirements

71.     To qualify for employment at Jackson Hewitt or its franchisees, each tax professional, as defined herein, must complete the entry level tax course, the Jackson Hewitt Basic Tax Preparation Course, or demonstrate equivalent knowledge by passing an internal exam.

21

72.     Jackson Hewitt's Basic Tax Preparation Course takes approximately 70 hours to complete.

73.     Upon completion, tax professionals obtain a Jackson Hewitt Certification. This Certification is a prerequisite for most, if not all, tax preparation jobs at Jackson Hewitt corporate or franchise locations.

74.     Jackson Hewitt and its franchisees require tax professionals to pass their internal exam every year.

75.     While Jackson Hewitt's Basic Tax Preparation Course covers general basic tax preparation skills, enrollees spend significant time learning skills specific to employment at Jackson Hewitt and its franchisees. For example, tax professionals at Jackson Hewitt must master working with ProFiler, Jackson Hewitt's proprietary interview-based tax preparation software. Because ProFiler is interview-based, it is designed and intended to be used by tax professionals servicing clients rather than by an individual preparing his/her own tax returns. And, because ProFiler is proprietary, it can be used only by Jackson Hewitt tax professionals. Thus, the knowledge and skills associated with use of ProFiler is specific to employment as a tax professional at Jackson Hewitt.

76.     Tax professionals may further enroll in Intermediate and Advanced Tax Courses at Jackson Hewitt.

835281.2

77.     Jackson Hewitt's website makes clear that completion of Jackson Hewitt's 70-hour Basic Tax Preparation Course "is neither an offer nor a guarantee of employment" at Jackson Hewitt or its franchisees, and "[a]dditional training, experience or skills may be required" for employment at Jackson Hewitt or its franchisees.

78.     Jackson Hewitt and its franchisees do not require tax professionals to have obtained degrees or general education levels. Rather, tax professionals must possess familiarity with Jackson Hewitt's products, services, and selling techniques and be able to "[p]resent[] the Company's value proposition to clients concerning various company products and services and use[] prescribed selling techniques."

79.     These Jackson Hewitt tax courses and certifications, as well as familiarity with Jackson Hewitt's products, services, and selling techniques, are the primary qualifications for open tax professional positions at corporate-owned and franchise offices.

80.     With limited educational qualifications apart from dozens of hours invested in Jackson Hewitt-courses and familiarity with Jackson Hewitt's products, services, and selling techniques, many tax professionals at Jackson Hewitt's corporate-owned and franchise locations are uniquely suited to working at Jackson Hewitt or one of its franchise locations. Thus, employees should generally be

highly mobile between and among Jackson Hewitt's corporate-owned and franchise offices.

81.      In the absence of Defendants' anticompetitive conduct, competition between and among Defendants and co-conspirators for Jackson Hewitt-trained workers in the highly specialized and technical tax preparation services industry, particularly within the Jackson Hewitt System, would be robust and would have increased and enhanced the workers' compensation and mobility.

**b.      The Jackson Hewitt System**

82.      In addition to the Jackson Hewitt courses, certifications, products, services, and selling techniques discussed above, all tax professionals at Jackson Hewitt and its franchisees must gain familiarity with Jackson Hewitt's proprietary Operating System.

83.      Each Jackson Hewitt corporate and franchise location must operate in accordance with Jackson Hewitt's "plan and system for preparing, checking and electronically filing income tax returns using our software, accounting methods, merchandising, equipment selection, advertising, promotional techniques, personnel training and quality standards that feature the Marks (the 'Operating System')." The Jackson Hewitt Operating System includes the Jackson Hewitt Operating Standards, Marks Standards, and Technology Standards.

835281.2

84.     A Jackson Hewitt affiliate, Jackson Hewitt Technology Services LLC, provides various technology services specifically for the Jackson Hewitt Operating System.

85.     As a result of completing Jackson Hewitt tax courses, certifications, and internal exams, and acquiring specialized knowledge as to the Jackson Hewitt proprietary Operating System, including Operating Standards, Marks Standards, and Technology Standards, as well as Jackson Hewitt's proprietary ProFiler tax return preparation software, employment with a non-Jackson Hewitt tax preparation company or business is not a reasonable substitute for the employees of Jackson Hewitt and its franchisees.

**E.     The Purpose and Effect of the Conspiracy was to Restrict Mobility and Suppress Compensation for Jackson Hewitt Tax Professionals**

**a.     Restricted and Reduced Mobility**

86.     Defendants' Conspiracy has restricted and reduced mobility between Jackson Hewitt corporate-owned and franchise locations.

87.     The Conspiracy restricted employees' mobility by decreasing the pool of potential employers and eliminating competition. This, in turn, has led to suppressed wages, compensation, and other benefits, compounded over the long term of the Conspiracy.

835281.2

88.     The Conspiracy and its harmful effects were not limited to tax professionals but extended to managers, executives, and other employees of Defendants.

**b.     Suppressed Compensation**

89.     Jackson Hewitt and franchisee employees have roles in tax preparation, customer service, and administrative or management positions. For each of these roles, employees of Jackson Hewitt and its franchisees are paid below the national salary for similar job titles.

90.     For example, Jackson Hewitt Senior Tax Preparers have an average base pay of approximately $11.00 per hour, which annualizes to a yearly salary of $22,963, while the national mean annual salary for a senior tax preparer is $76,795. Jackson Hewitt Tax Preparers reportedly earn approximately $10.90 per hour, which annualizes to $22,714, while the national mean annual salary for tax preparers is $28,205.

91.     Figure 1 below shows approximate average earnings at Jackson Hewitt compared to national figures for comparable positions.

**Figure 1**

835281.2

## Jackson Hewitt Average Salary v. National Average Salary
## Tax Employees

| Job Title | Jackson Hewitt | | National Average Salary | Percentage Below National Average |
| | Hourly Wage | Annual Salary | | |
| (1) | (2) | (2)*2080 (3) | (4) | ((4)-(3))/(4) (5) |
| --- | --- | --- | --- | --- |
| 1. Certified Public Accountant | $  15.0 | $  31,200 | $  84,235 | 63% |
| 2. Senior Tax Preparer | 11.0 | 22,963 | 76,795 | 70% |
| 3. Tax Manager | 16.6 | 34,507 | 107,018 | 68% |
| 4. Tax Preparer | 10.9 | 22,714 | 28,205 | 19% |

92.     But for the Conspiracy, employee compensation at Jackson Hewitt corporate-owned and franchise offices would be significantly higher.

## F.     Illegality and Anticompetitive Harm of Franchise No-Poach Agreements

93.     On or about July 9, 2018, the Attorneys General of ten states and of the District of Columbia announced an investigation into the anticompetitive hiring and recruiting practices and procedures used by several large franchise companies, and stated that:

> [W]e are concerned about the use of No Poach Agreements among franchisees and the harmful impact that such agreements may have on employees in our States and our state economies generally. By limiting potential job opportunities, these agreements may restrict employees' ability to improve their earning potential and the economic security of their families. These provisions also deprive other franchisees of the opportunity to benefit from the skills of workers covered by a No Poach Agreement whom they would otherwise wish to hire. When taken in the aggregate and replicated across our States, the economic consequences of these restrictions may be significant.

27

94.     On or around December 20, 2018, Jackson Hewitt entered into an Assurance of Discontinuance with the State of Washington through its Attorney General. In particular, Defendant Jackson Hewitt, Inc. agreed, among other things, to remove the No-Poach Clause from its franchise agreement going forward and to cease enforcement of the No-Poach Clause.

95.     Despite the removal of the No-Poach Clause from Jackson Hewitt's franchise agreements, the Conspiracy and Jackson Hewitt's No-Poach Culture continues and the anticompetitive harms are ongoing.

## V.     CO-CONSPIRATORS AND AGENTS

96.     The anticompetitive and unlawful acts alleged against Defendants were authorized, ordered or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

97.     Individuals and/or entities not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

98.     Each Defendant acted as the principal, agent, or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. The agency relationships formed among the Defendants

835281.2

with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the Defendant principals and agents.

99.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority.

## VI.   CLASS ACTION ALLEGATIONS

100.    Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All persons who worked at any Jackson Hewitt location in the United States, whether owned and operated by Jackson Hewitt or by its franchisee, at any time between December 20, 2014, and the present.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

101.    Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants or co-conspirators and their wholly owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

102.    Plaintiffs do not yet know the exact size of the Class because such information is in the exclusive control of Defendants and the co-conspirators, but,

29

based upon the nature of trade and commerce involved, as well as the scope and duration of the Conspiracy, Plaintiffs believe that there are at least thousands of Class members, and that Class members are geographically dispersed throughout the United States. Therefore, joinder of all members of the Class is not practicable.

103.    The questions of law or fact common to the Class include, but are not limited to:

        a.    whether the Conspiracy violated the Sherman Act;

        b.    whether the Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

        c.    whether the Conspiracy and associated agreements restrained trade, commerce, or competition for labor;

        d.    whether Plaintiffs and the Class suffered antitrust injury or were threatened with injury; and

        e.    the type and measure of damages suffered by Plaintiffs and the Class.

104.    These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

105.    Plaintiffs' claims are typical of the claims of the Class.

106.    Plaintiffs will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

835281.2

107.     Plaintiffs have retained competent counsel experienced in antitrust litigation, and specifically with respect to antitrust litigation involving agreements regarding hiring, recruiting, no-poach agreements, and Class action litigation to represent themselves and the Class.

108.     Defendants and the co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

109.     This Class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a Class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a Class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.   ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION

110.     The Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented, and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of fixing, retraining, and stabilizing the compensation paid to their personnel at artificially low levels.

31

111.    The harm not only reached individuals who sought to change their employment from one franchise or corporate office location to another, but also extended to those who had no intention of changing from one franchise or corporate office location to another, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

112.    While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for employees and potential employees of Jackson Hewitt and its franchises, as defined herein, in the United States.

113.    Through their Conspiracy, Defendants exercised and maintained this power, and did in fact suppress wages, benefits, and other aspects of compensation and eliminate competition.

114.    The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects.

115.    In the alternative, any procompetitive effects that may have resulted from the Conspiracy and/or the conduct of Defendants and their agents and co-conspirators in furtherance thereof were and are substantially outweighed by the

anticompetitive harm alleged herein, including, but not limited to, restricting employee mobility and suppressing wages, benefits, and other aspects of compensation.

116.    Defendants are also liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on Class members and markets.

## VIII.  CLAIM FOR RELIEF

**(Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3)**

117.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint, and further allege the following:

118.    Beginning no later than December 20, 2014, and continuing to the present, Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

119.    Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing, and stabilizing the wages, benefits and other aspects of compensation of Plaintiffs and the Class at artificially low levels; and (b)

835281.2

eliminating, to a substantial degree, competition among Defendants and their co-conspirators for labor.

120.    As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

121.    The unlawful agreements among Defendants and their co-conspirators have had the following effects, among others:

      a.  competition among Defendants and their franchisees for labor has been suppressed, restrained, and eliminated; and

      b.  Plaintiffs and Class members have received lower compensation from Defendants and franchisees than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

122.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

123.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Sections 1 and 3 of the Sherman Act.

124.    Accordingly, Plaintiffs and Class members are entitled to three times their damages caused by Defendants' violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## IX.    DEMAND FOR JURY TRIAL

125.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the Class, demands a jury trial as to all issues triable by a jury.

## X.    PRAYER FOR RELIEF

126.    WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and that of the Class by adjudging and decreeing that:

a.  This action may be maintained as a Class action, with Plaintiffs as the designated Class representatives and their counsel as Class counsel;

b.  Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, and that Plaintiffs and the Class members have been damaged and injured in their business and property as a result of this violation;

835281.2

c.  The alleged combinations and Conspiracy are *per se* violations of the Sherman Act;

d.  Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

e.  Judgment be entered for Plaintiffs and Class members, and against Defendants, for three times the amount of damages sustained by Plaintiffs and the Class, as allowed by law;

f.  Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.  Plaintiffs and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

h.  Plaintiffs and the Class are entitled to such other and further relief as is just and proper under the circumstances.


Dated: November 1, 2021                    Respectfully submitted,

**HARTLEY LLP**                            */s/ Bruce D. Greenberg*
Jason S. Hartley (*pro hac vice*)          **LITE DEPALMA GREENBERG &**
101 West Broadway, Suite 820               **AFANADOR, LLC**
San Diego, California 92101                Bruce D. Greenberg
(619) 400-5822                             570 Broad Street, Suite 1201
hartley@hartleyllp.com                     Newark, New Jersey 07102
                                           (973) 877-3820
                                           bgreenberg@litedepalma.com


36

835281.2

**PAUL LLP**
Richard M. Paul III (*pro hac vice*)
Laura C. Fellows (*pro hac vice*)
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
(816) 984-8100
Rick@PaulLLP.com
Laura@PaulLLP.com

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (*pro hac vice*)
Amanda M. Williams (*pro hac vice* forthcoming)
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongleuk.com

**ADHOOT & WOLFSON, PC**
Tina Wolfson (*pro hac vice* forthcoming)
10728 Lindbrook Drive
Los Angeles, California 90024
(310) 474-9111
twolfson@adhootwolfson.com

**JOSEPH SAVERI LAW FIRM, INC.**
Joseph R. Saveri (*pro hac vice*)
James G.B. Dallal (*pro hac vice* on file)
601 California Street, Suite 1000
San Francisco, California 94108
(415) 500-6800
jsaveri@saverilawfirm.com
jdallal@saverilawfirm.com

**FREED KANNER LONDON & MILLEN LLC**
Douglas A. Millen (*pro hac vice*)
Brian Hogan (*pro hac vice*)
2201 Waukegan Road, Suite 130
Bannockburn, Illinois 60015
(224) 632-4500
dmillen@fklmlaw.com
bhogan@fklmlaw.com

**ATTORNEYS FOR PLAINTIFFS**

37